# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 7, 2008

## STATE OF TENNESSEE v. DEMOND LAMONT ADKINS

**Appeal from the Criminal Court for Davidson County**
**No. 2005-D-3299     Monte Watkins, Judge**

---

**No. M2007-01728-CCA-R3-CD - Filed December 4, 2008**

---

A Davidson County Criminal Court jury convicted the defendant, Demond Lamont Adkins, of aggravated assault and carjacking. The trial court imposed concurrent sentences of 15 years at 60 percent for aggravated assault and 22 years at 45 percent for carjacking. In this appeal, the defendant challenges the sufficiency of the evidence, and discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Dumaka Shabazz, Nashville, Tennessee, for the appellant, Demond Lamont Adkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On August 15, 2005, Metropolitan Nashville-Davidson County ("Metro") police officer Selene Julia responded to a call of "burglary in progress" in Madison and encountered the defendant walking along the side of the road. Because she believed the defendant might have been involved in the earlier call, Officer Julia pulled her vehicle alongside the defendant and "asked him a question and he said something to the [e]ffect of it was none of [her] business" before walking away. At that point, because of the vast difference between the defendant's stature and her own, Officer Julia chose to wait for "back up" to arrive before approaching the defendant a second time.[1] When Officer Troy Smith arrived, the two officers blocked the roadway with their patrol cars and again attempted to question the defendant. Officer Julia explained, "We were going to attempt to place him into custody until we could get the issue resolved and figure out what was going on. At

---

[1]The presentence report lists the defendant as standing six feet, three inches and weighing 294 pounds.

that time the defendant had yanked an arm out from my control and attacked Officer Smith." She testified that the defendant "lunged" at Officer Smith and pinned the officer against a guardrail before forcing him "over the guardrail backwards." After the defendant finished with Officer Smith, he turned to Officer Julia, "lifted [her] over his head and threw [her]" over the guardrail. She stated that she landed on her head and neck "and tried to roll over" to avoid further injury.

Realizing that both she and Officer Smith "were hurt," Officer Julia "called for other officers to start en route" and asked that an ambulance be dispatched to the area because "Officer Smith was really hurt." Following the incident she was transported to Vanderbilt University Medical Center ("Vanderbilt"), where she was treated and released. She testified that she recalled little else because she had sustained "some kind of head injury . . . and . . . a neck and a back sprain."

Officer Julia testified that, as a result of the injuries she sustained during the altercation with the defendant, she missed three days of work and suffered from "constant back pain."

Officer Troy Smith testified that he, too, responded to the "burglary-in-progress" call on August 15, 2005, and recalled that when he arrived on the scene, he saw "a subject walking away from [Officer Julia], yelling loudly, and with his fist balled up in a fighting stance." Officer Smith stated that the defendant, who matched the description of the suspect in the earlier call, "appeared to be large, and upset." Officer Smith recalled that the defendant "appeared very belligerent and he was assuming a fighting stance . . . with his shoulders squared back and his fist balled up, walking away from her and yelling over his shoulder." When the defendant "turn[ed] toward [Officer Julia] with his fist balled up[, a]pparently, intending to strike her," Officer Smith attempted to spray the defendant with pepper spray, which only angered the defendant. The defendant knocked the spray out of Officer Smith's hand, and the two "began to grapple." The defendant forced Officer Smith "backwards across the road . . . and over a guardrail, which is at the edge of the drop-off to the ravine." Officer Smith testified that his "knee got twisted" and that he "went rolling down the ravine, ten, fifteen feet." The officer testified that he tried to get back up but his "knee gave way." Because he had lost his glasses, he "couldn't see anything" but "heard something come down the hill." He looked up to see Officer Julia "airborne, coming off the rail."

After the altercation, Officer Smith was transported by ambulance to Vanderbilt, where he was treated and released. He explained that, as a result of the altercation, he suffered a "wrenched" back and a "wrenched" knee. He stated that the knee injury was "going to be permanent" and that it had significantly limited his mobility. He recalled that he missed three weeks' work as a result of the injuries to his back and knee.

Robert Heriges testified that he was returning to his home on Heritage View Court in Madison when he saw two police cars blocking the roadway. Assuming that the commotion was "some kids in the area, or something," he decided "to wait until they cleared out, because it's a long way to go back to Gallatin Road." As he waited, he saw two police officers approach "a gentleman . . . walking down Williams Avenue" and attempt to place the man under arrest. Mr. Heriges stated

that "everything looked Hunky Dory.  And, then, all of a sudden all pandemonium broke loose."  He saw the defendant force a male police officer over the guardrail and then "he picked the one, lady officer up, bench-pressed her over his head and threw her over."  At that point, Mr. Heriges "jumped out of [his] car and ran across the street" to check on the officers.

When another neighbor went toward the area where the officers were, Mr. Heriges returned to his car and observed the defendant walking toward him.  Mr. Heriges testified that the defendant "very politely, asked for a ride."  When Mr. Heriges refused, the defendant grabbed the car door and "then he reared back . . . like he was going to hit" Mr. Heriges.  Mr. Heriges then released his grip on the car door, and the defendant "jumped in."  Mr. Heriges recalled that he put his arm in the door in an attempt to prevent the defendant from leaving, but the defendant "shut the door on it" and "started pulling away."  The defendant dragged Mr. Heriges a short distance before he "went flying the other way down Williams, away from the police officers."  Mr. Heriges testified that he felt threatened during the incident, explaining, "He was going to knock my head off."

Mr. Heriges recalled that the defendant "totaled" his car in a wreck only a few miles from the altercation.  He stated that police officers asked him to "walk by the police car [the defendant] was in and identify him."

During cross-examination, Mr. Heriges acknowledged that the defendant did not "grab [him] out of the car" and that he did not brandish a gun or knife during the altercation.  Mr. Heriges insisted, however, that he "considered [the defendant's] fist a weapon."  He admitted that the defendant made no verbal threats but reiterated, "He waived his fist.  And that's about as threat[ning] as you can get."

Officer Joe Pennington was responding to the "officer down" call issued by Officer Julia when he saw a vehicle accident at Old Hickory Boulevard and I-65.  He explained that he initially drove past the accident because "it was a priority to get to help those officers, because at the rate it was going on the radio [he] was the closest one."  As he drove toward the officers' location, he heard "a description of a vehicle that was stolen, that was involved with the incident of the officers that were needing assistance" and realized that the vehicle described "was one of the vehicles that was involved in the accident."  Officer Pennington turned around and went back to the scene of the accident, where he learned that the driver of the suspect vehicle had fled on foot.

At that point, Officer Pennington "went down to the next street from the street that they had point[ed] the driver of the vehicle could be running down, trying to cut him off."  He elaborated, "I got into the turning lane, cut off my lights, and blacked out my car, just started creeping down the turning lane of Graycroft."  In a moment, "the defendant ran across the street in front of [the] patrol car with no shirt on, crossing the street, going up into a yard."  Officer Pennington exited his vehicle, aimed his "taser" at the defendant, and ordered the defendant to stop.  The officer explained that the taser emitted a "[t]arget beam" and that the defendant "was very compliant as long as that red dot was on him."  After being arrested, the defendant remained in Officer Pennington's patrol car while the investigation took place.

Donna Petway, the defendant's longtime friend and former girlfriend, testified that on the day of the offenses, she "got a phone call to come and pick him up." She stated that when she arrived at the appointed location, she saw the defendant "running towards" her car. She testified that the defendant did not come to her car and instead got into a maroon car that was sitting empty. Ms. Petway recalled that the defendant "pulled off, and then that's when the guy started running back towards the car."

At the conclusion of the trial, the jury convicted the defendant of the aggravated assault of Officer Smith and carjacking. The jury was unable to reach a verdict on the charge of the aggravated assault of Officer Julia. Following a sentencing hearing, the trial court imposed an effective sentence of 22 years' incarceration.

In this appeal, the defendant challenges only the sufficiency of the convicting evidence, arguing that the State failed to prove that Officer Smith suffered serious bodily injury or that the defendant threatened Mr. Heriges. The State disagrees.

We review the defendant's claims mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

During our review, this court must not re-weigh the evidence, and we are not free to substitute our own inferences for those drawn by the trier of fact. *Id.* at 655. "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)); *see also State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superceded by statute on other grounds as stated in State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Vasques*, 221 S.W.3d at 521; *Cabbage*, 571 S.W.2d at 835.

As is applicable in this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [c]auses serious bodily injury to another." T.C.A. § 39-13-102(a)(1)(A) (2003). The defendant concedes his guilt of assault as defined in Code section 39-13-101 and challenges only the jury's finding of serious bodily injury. "'Serious bodily injury' means bodily injury that involves . . .[a] substantial risk of death; . . . [p]rotracted unconsciousness; . . . [e]xtreme physical pain; . . . [p]rotracted or obvious disfigurement; or . . . [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." *Id.* § 39-11-106(34).

-4-

The evidence at trial established that the defendant "attacked" both Officer Julia and Officer Smith as they attempted to question him in regards to the "burglary in progress" call. He initially pinned Officer Smith against a guardrail and then forced him over the rail into a "ravine" or "culvert." Officer Smith testified that, as a result of the scuffle and fall, his knee and back were "wrenched," causing severe pain and forcing him to miss three weeks' work. He stated that the injury to his knee had resulted in "permanent" impairment that affected his ability to climb stairs and run. The permanent impairment of Officer Smith's knee and back qualifies as serious bodily injury and was sufficient to support the jury's verdict.

Carjacking, as charged in this case, "is the intentional or knowing taking of a motor vehicle from the possession of another by use of . . . [f]orce or intimidation." *Id.* § 39-13-404(a)(2). The defendant concedes taking Mr. Heriges' vehicle but contends that the State failed to prove that he did so by force or intimidation. "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." *Id.* § 39-11-106(12).

Here, the evidence established that the defendant asked Mr. Heriges for "a ride" and, upon Mr. Heriges' refusal, took the vehicle over Mr. Heriges' protests. Mr. Heriges testified that the defendant "grabbed" the car door and "then he reared back . . . like he was going to hit" Mr. Heriges. Once inside the car, the defendant closed Mr. Heriges' arm in the door and dragged him a short distance. Mr. Heriges testified that he felt threatened by the defendant's conduct and believed the defendant was going to "knock [his] head off." This evidence more than amply satisfies the elements of force and intimidation.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE